UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | Case No. 21-cv-00448 |
| ) | |
| JORGE MANUEL BRAVO CRUZ ) | |
| HOLIDAYS NETWORK GROUP, LLC ) | |
| HOLIDAYS LOUNGE, LLC ) | |
| ASCENDANT HOLIDAYS, LLC ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) | |
| ) | |
| FRANCISCO RICARDO HUESCA SEGURA ) | |
| ) | |
| ) | |
| Defendant ) | |
| ) | |
| ) | |
| _____/ | |

## COMPLAINT

Plaintiffs, JORGE MANUEL BRAVO CRUZ (hereinafter "Bravo"), and

HOLIDAYS NETWORK GROUP, LLC (hereinafter "Holidays Network Group"),

HOLIDAYS LOUNGE, LLC ("Holidays Lounge"), and ASCENDANT

HOLIDAYS LLC ("Ascendant Holidays") file this Complaint for abuse of process,

tortious interference with a business relationship, and violations of the Florida

Deceptive and Unfair Trade Practices Act (FDUTPA) against the above-captioned

1

Defendant FRANCISCO RICARDO HUESCA SEGURA ("Huesca"), and allege as follows:

INTRODUCTION

Defendant Huesca, a citizen of Spain and a permanent resident of the Dominican Republic, commenced a sham criminal proceeding for fraud *(estafa)* in the Dominican Republic subjecting Plaintiff Jorge Bravo, a citizen of the state of Florida, to a potential jail sentence of 2 years to ensure that Bravo acquiesces to Huesca's extortionate demand to pay nearly ***one Million dollars***. *See* **Exhibit A,** Certified Translation of Affidavit of Attorney Samuel Orlando Perez. Huesca initiated this sham criminal proceeding on foreign soil in retaliation for Bravo's termination of an unconscionable marketing agreement negotiated by Bravo and Huesca and in retaliation for Bravo's filing of a civil lawsuit against Huesca in the Dominican Republic for the losses sustained by Bravo and his related companies. Huesca now continues to pursue his sham criminal fraud action in the Dominican Republic unless Bravo accedes to Huesca's extortionate demands. The Huesca-initiated fraud action has caused economic harm to Plaintiffs and Bravo's related companies and has resulted in Bravo's loss of critical contracts.

<u>PARTIES AND RELATED ENTITIES</u>

1.    Plaintiff, Jorge Manual Bravo Cruz ("Bravo") is a citizen of the State of Florida and a successful entrepreneur with 25 years of experience in resort operations and vacation ownership sales. Bravo was previously awarded the Silver America Resort Development Association (ARDA) Award and is a former managing director of Viva Wyndham Resorts operations.

2.    Plaintiff, Holidays Network Group, LLC ("Holidays Network Group") is a Florida limited liability company and a citizen of the state of Florida.  Bravo is the president of Holidays Network Group. Holidays Network Group is the parent company of a group of companies that specialize in resort operations, vacation club sales, and is a travel operator with operations in Miami and Orlando Florida, the Dominican Republic in partnership with the Sunset Group Cancun. *See* https://www.sunsetworldresorts.com. Holidays Network Group is also a named defendant in a criminal fraud action in the Dominican Republic.

3.    Plaintiff Holidays Lounge, LLC ("Holidays Lounge") is a limited liability company organized under the laws of the state of Florida and is a citizen of the state of Florida. Holidays Network Group also owns and controls Fifty percent (50%) of Holidays Lounge.

4.    Plaintiff Ascendant Holidays, LLC ("Ascendant Holidays") is a limited liability company organized in the State of Florida and is a citizen of the state of

Florida. Holidays Network Group also owns and controls Fifty percent (50%) of Ascendant Holidays.

5.      Defendant Ricardo Huesca ("Huesca") is a citizen of the country of the Spain and a permanent resident of the country of Dominican Republic. Huesca is the president of Aeroyacht Club LLC.

6.      Aeroyacht Club LLC ("Aeroyacht Club") is a limited liability company organized under the laws of Panama and a citizen of the country of Panama. At all times relevant to this action, Aeroyacht Club was controlled by its president, Defendant Huesca. Aeroyacht Club maintains no less than One (1) bank account in Miami, Florida at Sabadell Bank located at 1111 Brickell Avenue, Miami Florida 33131 ("Sabadell Account"). The Sabadell Account received monies from companies controlled, directly or indirectly by Bravo. Upon information and belief, revenues generated from Aeroyacht Club, and other companies controlled by Defendant Huesca, are deposited, wired, or transferred to the Sabadell account located in Florida.

7.      Club Ancora S.A., ("Club Ancora") is a company organized under the laws of Panama and a citizen of the country of Panama which operates in the Dominican Republic marketing vacation sales packages primarily at the Ancora hotel in Punta Cana, Dominican Republic. Bravo is the president and director of Club Ancora.

8.     Big Pond Enterprises, SRL ("Big Pond") is a company organized under the laws of the Dominican Republic and is a citizen of the Dominican Republic. Big Pond was established by Bravo to provide sales and marketing services in connection with the Dominican Republic in connection with the memberships offered by Club Ancora in the Dominican Republic.  Martin Jose Paniagua Damalsi is the president of Big Pond.

9.     GT Marketing Group, SRL ("GT Marketing") is a company organized under the laws of the Dominican Republic and is a citizen of the Dominican Republic. GT Marketing performs marketing services for Club Ancora and Big Pond. Bravo exercises control over GT Marketing's operations and finances directly and/or indirectly.

PRESTAMOS LOAN AGREEMENTS WITH PLAINTIFFS

10.     Prestamos Solutions, LLC ("Prestamos") is a limited liability company organized in the State of Florida and is a citizen of the State of Florida. Prestamos is a private lender that, as set forth below, entered into several valuable lending agreements with Plaintiff Bravo, Plaintiff Holidays Lounge, and Plaintiff Ascendant Holidays. Prestamos is also a named defendant in a criminal fraud action initiated by Huesca in the Dominican Republic.

11.     In or around October 21, 2016, Plaintiff Holidays Lounge and Plaintiff Ascendant Holidays entered into a Hypothecation Loan and Security Agreement

with Prestamos ("2016 Agreement"). *See* **Exhibit B** attached herein. Prestamos is listed as the "Lender" in the 2016 Agreement. *Id.* Plaintiff Bravo executed the 2016 Agreement on behalf of Plaintiff Holidays Lounge and Plaintiff Ascendant Holidays who are listed as "borrowers.' *Id.* Plaintiff Bravo also executed the 2016 Agreement personally, as the guarantor. *Id.* Pursuant to the 2016 Agreement, Plaintiffs Holidays Lounge and Ascendant Holidays, as borrowers, were entitled to a revolving credit facility of Two Million dollars. *Id.*

12.     In or around June 30, 2019, a First Amendment to the 2016 Agreement was executed by Prestamos, as the lender, and by Plaintiff Holidays Lounge, Plaintiff Ascendant Holidays, and Club Ancora S.A. as borrowers ("2019 Amendment"). Plaintiff Bravo also executed the 2019 Amendment as a guarantor. *See* **Exhibit C** attached herein.

13.     In or around June 30, 2019, Plaintiff Holidays Lounge and Plaintiff Ascendant Holidays entered into a second Hypothecation Loan and Security Agreement with Prestamos ("2019 Agreement"). *See* **Exhibit D** attached herein. Prestamos is listed as the "Lender" in the 2019 Agreement. *Id.* Plaintiff Bravo executed the 2019 Agreement on behalf of Plaintiff Holidays Lounge, Plaintiff Ascendant Holidays, and Club Ancora, S.A., who are listed as "borrowers." *Id.* Plaintiff Bravo also executed the 2019 Agreement personally, as the guarantor. *Id.* Pursuant to the 2019 Agreement, Plaintiff Holidays Lounge, Plaintiff Ascendant Holidays, and Club

Ancora, S.A., as borrowers, were entitled to a revolving credit facility of One Million

dollars. *Id.*

## JURISDICTION & VENUE

14.    This Court has subject matter jurisdiction over all claims for relief pursuant

to 28 U.S.C. §1332(a)(1) because the parties, as citizens of different States, are of

diverse citizenship and the amount in controversy as to each claim (Claims 1, 2 and

3) exceeds $75,000, exclusive of interest and costs.

15.    Defendant Huesca is subject to the personal jurisdiction in the State of Florida

because Huesca has committed and/or caused within this district the torts and other

violations of law as set forth herein which have directly affected Plaintiff Bravo, a

citizen of the state of Florida and a resident of Orange County, Florida. *See* Fla. Stat.

Section 48.193(1)(b). Huesca has also traveled to Orlando, Florida and has been

unjustly enriched through transfers of Hundreds of Thousands of dollars to the

Sabadell Account located in Florida controlled directly or indirectly by Huesca by

virtue of his wrongful conduct.  Based upon information and belief, the revenues

generated by Defendant Huesca through Aero Yacht Club and his other companies

are deposited, transferred, or wired to the Sabadell account.

16.    Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because certain

transactions, practices, and courses of business, and wrongful acts as alleged herein

have occurred in this district.

17.    Pursuant to 28 U.S.C. § 1391(c)(3), venue is proper in this district because "any defendant not a resident in the United States may be sued in *any judicial district.*" Defendant Huesca is neither a resident of the United States nor a resident of any state in the United States.

FACTUAL ALLEGATIONS

### I.    Club Ancora/Big Pond and Aero Yacht Club Enter into a Marketing Agreement

18.    In or around October of 2018, Carmen Scarone, the former Chief Operating Officer of Holidays Network Group was contacted by Defendant Huesca to arrange a business meeting with Plaintiff Bravo in Punta Cana, Dominican Republic.

19.    At or around this time, Plaintiff Bravo was interested in selling Club Ancora memberships to guests of other hotels in Punta Cana, Dominican Republic.

20.    Club Ancora sells memberships which are a mix of vacation club packages to customers. Each member of Club Ancora has access to the Ancora Resort and Marina in Punta Cana, Dominican Republic, and several other ancillary benefits. [1]

21.    Shortly after the October 2018 email from Defendant Huesca, Plaintiff Bravo met with Huesca in Punta Cana to potentially broker a marketing arrangement between Club Ancora and Aero Yacht Club.

---

[1] http://www.ancorapuntacana.com/

22.    At that time, Aero Yacht Club had an exclusive marketing agreement with the Hotel Vista Sol in Punta Cana Dominican Republic to market their boat packages to guests of Hotel Vista Sol.

23.    From October 2018 through January of 2019, Plaintiff Bravo and Defendant Huesca engaged in negotiations regarding a potential agreement which would permit Plaintiff Bravo and his related companies, including Club Ancora and Big Pond to market Club Ancora vacation packages at the Hotel Vista Sol. The arrangment would also include access to a yacht club and a fleet of boats operated by Aero Yacht as part of the Club Ancora membership.

24.    During those negotiations, in an email dated January 13, 2019, Defendant Huesca falsely represented to Plaintiff Bravo, among other persons, that the Hotel Vista Sol Punta Cana Beach Resort and Spa had 600 rooms and maintained "90% occupancy."

25.    During those negotiations, in an email dated January 13, 2019, Defendant Huesca represented to Plaintiff Bravo, among other persons, that 70% of the guests at the Hotel Vista Sol Punta Cana Beach Resort and Spa were from the United States, Latina America, and Canada and 30% were from Russia and German and/or other European countries.

26.    To the contrary, the majority of the guests at the Hotel Vista Sol Punta Cana Beach Resort were from Europe and were from countries other than the United States, Canada, and Latin America.

27.    The above representations were material to Plaintiff Bravo and Plaintiff Bravo relied on those representations in deciding whether to enter into an agreement with Aero Yacht Club.

28.    Ultimately, Defendant Huesca and Plaintiff Bravo reached an agreement which was executed on January 29, 2019. The agreement was executed by the legal representative of Big Pond, Martin Jose Paniagua Damalsi, on behalf of Big Pond, and by Defendant Huesca, on behalf of Aero Yacht Club.

29.    At the time of the execution of the agreement, Plaintiff Bravo reasonably understood that Big Pond, through sales representatives, would be granted the exclusive right to market Club Ancora vacation packages to guests of the Hotel Vista Sol.

30.    To market Club Ancora vacation packages to the Hotel Vista Sol guests, sales representatives would also occupy three different booths (one on the beach, one in the hotel lobby, and one in restaurant).

31.    Pursuant to this agreement, Club Ancora membership would also include Aero Yacht memberships as an "add on" which would allow Club Ancora members to access a yacht club and to schedule boat rides and boat tours.

32.    To effectuate this agreement, Big Pond agreed to pre-purchase 5000 Aero-Yacht memberships per year at a price of One Million dollars ($1,000,000.00) for 3 years for a total of Three Million dollars ($3,000,000.00) with payments of Eighty-Three Thousand Three Hundred and Thirty-Three cents ($83,333.33) to be made monthly to Aeroyacht Club. [2]

## II.    The Agreement Causes Substantial Losses to Bravo After 3 Months

33.    Big Pond performed the agreement for three months from February of 2019 until April of 2019.

34.    On January 31, 2019, GT Marketing paid $35,000.00 to the Sabadell Account.

35.    On January 31, 2019, Prestamos paid $35,000.00 to the Sabadell Account.

36.    On March 11, 2019, Club Ancora paid $83,333.33 to the Sabadell Account.

37.    On March 18, 2019, Club Ancora paid $8,358.30 to the Sabadell Account.

38.    On April 16, 2019, Club Ancora paid $14,000 to the Sabadell Account.

39.    On April 22, 2019, Club Ancora paid $42,362.35 to the Sabadell Account.

40.    During this time, the hotel occupancy at the Hotel Vista Sol was far less than the 90% occupancy rate Defendant Huesca had represented to Plaintiff Bravo.

---

[2] Based on information and belief, Huesca has entered into similar agreements with no less than 3 other companies in Punta Cana. Each company has terminated the agreement. Yet each company has also paid then unconscionable penalty to Huesca and Aero Yacht Club.

41.    During this time, guests from the Hotel were from countries other than the United States, Canada, and Latin America.

42.    During this time, Big Pond sold a mere 21 vacation packages which included the Aero Yacht package component pursuant to the Agreement.

43.    Based on the representations made by Defendant Huesca regarding the occupancy of the hotel and the nationalities of the guests, among other things, Plaintiff Bravo had projected that Big Pond would sell Twenty Percent (100 memberships sold out of 500 hotel guests).

44.    Further, during this time, Aero Yacht did not construct a website to enhance sales at the Hotel Vista Sol.

45.    Between April 2, 2019 and April 4, 2019, Plaintiff Bravo and Defendant Huesca exchanged emails wherein Bravo disagreed with Huesca's self-imposed cancellation policy.

46.    According to that policy, whenever a guest cancels a booking for a boat tour, Club Ancora, S.A., controlled by Plaintiff Bravo, must pay a One Thousand dollar ($1,000) penalty.

47.    During this time Plaintiff Bravo also advised Defendant Huesca that the monthly rent of $83,333.33 must be reduced because of, among other things, the anemic profits that Big Pond had generated in sales from marketing to guests at Hotel Vista Sol.

48.    On or about April 9, 2019, in response to Plaintiff Bravo's request to modify the unconscionable agreement, Defendant Huesca traveled to Orange County, Florida to meet with Plaintiff Bravo.

49.    The sole purpose of Defendant Huesca's trip to Orange County, Florida was to induce Plaintiff Bravo to persuade Sunset Group Cancun (a partner company of Plaintiff Holidays Network Group) to pay the difference in the monthly rent payments or pay 60 days of rent for a total of $160,000.00.

50.    Those negotiations failed.

### III.    Bravo Terminates the Agreement & Huesca Threatens Criminal Prosecution and to "Put Bravo in Jail"

51.    On or about April 28, 2019, Plaintiff Bravo sent an email to Defendant Huesca and advised Defendant Huesca that Big Pond intended to terminate the contract with Aeroyacht unless Defendant Huesca agreed to reduce the monthly rent amount.

52.    On or about April 30, 2019, Defendant Huesca advised Plaintiff Bravo that he was unwilling to release Plaintiff Bravo from the contract and that Plaintiff Bravo must perform the contract for at least another 60 days.

53.    On or around May 1, 2019, Plaintiff Bravo then travelled to the Dominican Republic to meet with Defendant Huesca to discuss the contract.

54.    When Plaintiff Bravo landed in the Dominican Republic airport Plaintiff Bravo and Defendant Huesca communicated by telephone.

55.    On that call, Plaintiff Bravo repeated to Defendant Huesca that the rent must be reduced.

56.    On that call Plaintiff Bravo advised Defendant Huesca that he was unwilling to pay the unconscionable termination penalty of Two Hundred Thousand dollars ($200,000.00).

57.    In response to Plaintiff Bravo's reasonable demands to modify what had become an unconscionable marketing arrangement where Plaintiff Bravo and his related companies were sustaining enormous losses, Defendant Huesca advised that "if you are not going to pay the penalty, I am not going to meet with you."

58.    Defendant Huesca further advised Plaintiff Bravo that he knew powerful government officials including the former Attorney General of the Dominican Republic and warned Plaintiff Bravo against non-payment.

59.    Defendant Huesca further advised Plaintiff Bravo that he was friends with "judges and prosecutors."

60.    Defendant Huesca threatened Plaintiff Bravo that "I will close you down."

61.    Defendant Huesca threatened Plaintiff Bravo "***I will put you in jail.***"

### IV.    Bravo Files a Civil Lawsuit against Aero Yacht Club

62.    On May 21, 2019, Big Pond filed a lawsuit against Aero Yacht Club and Huesca in the Dominican Republic.

63.    Within 30 days of its filing, the lawsuit was served on Huesca in Punta Cana, Dominican Republic.

64.    The lawsuit alleged that Defendant Huesca and Aero Yacht had breached the Agreement and demanded payment in the amount of several hundred Thousand dollars to compensate Big Pond for the monthly payments made by Big Pond, GT Marketing, and Club Ancora, collectively, to the Sabadell Account maintained by Aeroyacht Club.

### V.    Huesca Initiates a Sham Criminal Proceeding for Fraud (*Estafa*) Against Bravo in the Dominican Republic for an Unlawful Object and Purpose

65.    On or about July 23, 2019, Defendant Huesca followed up on his promise to put Plaintiff Bravo in jail by commencing a criminal action for fraud (*estafa*) in the Dominican Republic subjecting Plaintiff Bravo to potential incarceration for a period of up to 2 years. *See* **Exhibit A** attached herein**.**

66.    "Estafa" is codified in the Dominican Republic Penal Code under Article 405 which states that a person convicted for fraud under Article 405 may be punished by *incarceration for up to 2 years* and a fine of up to Two Hundred Thousand dollars ($200,000.00) or both. *Id.*

67.    The criminal lawsuit also named Plaintiff Holidays Network Group, Prestamos, Club Ancora, Big Pond, GT Marketing, and Martin Jose Paniagua Dalmasi as *criminal defendants.*

68.    Following the filing of the criminal fraud action above, an arrest warrant was issued for Bravo.

## VI.    Extortion Under Florida and Federal Law

69.    Fla. Stat. Section 836.05 defines extortion as: "Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, shall be guilty of a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[3]

---

[3]  "Extortion is "closely related to the crime of robbery, having in fact been created in order to plug a loophole in the robbery law by covering sundry threats which will not do for robbery." *United States v. Harris*, 916 F.3d 948, 955 (11th Cir. 2019), quoting LaFave, *Criminal Law* § 20.4, at 1335–36. "Self-interest is always at play in extortion: the idea behind extortion is that the victim gives up his property so that some worse harm will not befall him." *Harris*, 916 F.3d at 957.

70.    18 U.S.C. Section 1951(a) (Hobbs Act) states: "Whoever in any way or degree obstructs, delays, or affects commerce[4] or the movement of any article or commodity in commerce, by robbery or ***extortion*** or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

71.    18 U.S.C. Section 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force,[5] violence, or fear, or under color of official right."

72.    18 U.S.C. Section 875(d) states: "Whoever, *with intent to extort from any person*, firm, association, or corporation, any money or other thing of

---

[4] *See United States v. Ransfer*, 749 F.3d 914, 936 (11th Cir. 2014) ("[C]ommerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.' " *United States v. Jackson,* 748 F.2d 1535, 1537 (11th Cir.1984) (quoting *United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978)). "[T]he government need only show a minimal effect on interstate commerce to sustain jurisdiction under the Hobbs Act."")

[5] *United States v. Harris*, 916 F.3d 948, 954 (11th Cir. 2019) ("Hobbs Act extortion "contains two elements: (1) ***extortion, and (2) interference with interstate commerce.''***  Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2)."). This Circuit has consistently held that economic threats are sufficient to demonstrate "extortion" under Section 1951(b)(2). *United States v. Bornscheuer,* 563 F. 3d 1228 (11th Cir. 2009) (extortion may be based on the wrongful use of fear which is defined as "a state of anxious concern, alarm, or apprehension of harm and includes a fear of economic loss as well as physical fear or violence."); *United States v. Pendergraft.* 297 F.3d 1198 (11th Cir. 2002); *United States v. Blanton,* 793 F. 2d 1553 (11th Cir. 1986).

value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both."

73.    In *Bornscheuer,* 563 F. 3d 1228, a Hobbs Act extortion and Travel Act conviction were affirmed by this Circuit. There, the extortionate conduct included, among other things, the filing of civil and criminal actions against the victim in Florida and in Germany and threats to continue such litigation and criminal prosecution if the victim did not pay a settlement. [6]

74.    As set forth herein, Defendant Huesca threatened to put Plaintiff Bravo in jail highlighting his connections with prosecutors and judges and then initiated a sham

---

[6] *See also United States v. Godwin-Painter*, No. CR415-100, at *1 (S.D. Ga. Oct. 5, 2015) (denying a motion to dismiss indictment alleging Hobbs Act extortion when Defendant filed a malpractice suit against his former attorney, M.T. and during settlement negotiations Defendant threatened to release certain damaging information unless M.T. resolved the litigation. Later, Defendant and M.T. agreed that if M.T. paid $8,000,000.00, then Defendant would drop the lawsuit and provide M.T. with the damaging information); *U.S. v. Jackson*, 180 F.3d 55, 59 (2d Cir. 1999) (affirming conviction for extortion in case involving defendants' attempts to obtain up to $40 million from William H. ("Bill") Cosby, Jr, by threatening to cause tabloid newspapers to publish claim to be Cosby's daughter out-of-wedlock. The witnesses at trial included Cosby, Jackson's grandmother, persons who had conversations with Jackson in which she demanded money from Cosby and threatened to injure his reputation if he did not pay, and a cooperating witness who had attended meetings during which defendants formulated and executed parts of their plan.); *La Suisse v. Moses Kraus & Caruso AG*, 06 Civ. 4404 (CM) (GWG), at *8-9 (S.D.N.Y. July 21, 2014) (denying motion to dismiss certain aspects of Civil RICO action premised on extortion finding that "[t]he brokers also attempted to extort La Suisse and Swiss Life by using the threat of litigation and actual litigation" through a series of litigation filings aimed at extracting money).

criminal prosecution against Plaintiff Bravo, Plaintiff Holidays Network Group and Plaintiff Bravo's related entities subjecting Plaintiff Bravo to a potential jail sentence of 2 years as a means to collect money from Plaintiffs.

## VII.   Arrest Warrant Issued in the Criminal Fraud Action During COVID

75.    In January of 2020, Plaintiff Bravo appeared for an initial hearing concerning the criminal fraud action in Punta Cana, Dominican Republic.

76.    A second hearing was scheduled for April 18, 2020, but the hearing was cancelled due to the global COVID-19 pandemic.

77.    A hearing was then scheduled for December 4, 2020.

78.    Prior to that hearing, Plaintiff Bravo, through his attorneys in the Dominican Republic, submitted a medical note from a doctor asserting that Plaintiff Bravo could not travel to the hearing for medical reasons (heart problems) and because of the risk posed by COVID.

79.    Despite Plaintiff Bravo's medical issues, on **December 9, 2020**, the court issued an arrest warrant for Plaintiff Bravo.

80.    Upon issuance of the arrest warrant, Plaintiff Bravo was reported to the Departmento de Profugios (Department of Fugitives) in the Dominican Republic which, upon information and belief, transferred that information to the U.S. Marshalls in the United States.

81.    Upon issuance of the arrest warrant, Plaintiff Bravo believed that Huesca, through his attorneys, would pressure the Dominican Republican authorities to publish a Red Notice[7] with Interpol.[8]

82.    Following the issuance of the arrest warrant, Defendant Huesca also requested that the court seek international assistance from the U.S. in order to produce certain records related to Plaintiff Bravo and his companies including, among other things, several years of tax returns and bank account statements.

83.    The court granted the request for international assistance.

84.    The request also sought records from business associates and affiliates of Plaintiffs including, among other entities, the Orlando Magic, the New York Yankees, and Carnival Cruise Lines.

85.    The request was designed solely to intimidate and harass Plaintiffs.

---

[7] https://www.interpol.int/en/How-we-work/Notices/Red-Notices.

[8] Any publication or attempted publication of any Red Notice would directly contravene Interpol Rules on the Processing of Data (RPD) (2019) since Article 83 of Interpol RPD states that Red Notices **may not be published** for "offences ….**deriving from private disputes**, unless the criminal activity is aimed at facilitating a serious crime or is suspected of being connected to organized crime." Available at https://www.interpol.int/content/download/5694/file/24%20E%20RPD%20UPDATE%207%201 1%2019_ok.pdf?inLanguage=eng-GB (last visited February 16, 2021)

86.    The request was designed to instill fear in Plaintiff Bravo and to induce Plaintiff Bravo to pay money to avoid damage to Plaintiff Bravo's critical commercial relationships.

87.    The request was designed to induce Plaintiff Bravo to believe that Defendant Huesca, through his attorneys, had the capacity to cause significant economic harm to Plaintiff Bravo and to Plaintiff Bravo's reputation in his business community.

## VIII. <u>Huesca Sends Messages to Other Executives in Bravo's Industry Revealing His Extortionate Plot to Extract Money from Bravo</u>

88.    On or about December 9, 2020, immediately after the court entered the arrest warrant for Plaintiff Bravo, Defendant Huesca sent the following What's App Message to Guillermo Cortijo, the General Director of Bahia Principe Hotels which included excerpts from the court's ***order of arrest*** from the same day against Plaintiff Bravo in the Dominican Republic:

> *Habiendo quedado la citación del imputado Jorge Manuel Bravo Cruz, a cargo de su defensa técnica, conforme al acta de audiencia anterior y en razón de la solicitud que realiza la parte querellante, declara en estado de Rebeldía al imputado Jorge Manuel Bravo Cruz, quien conforme a certificado médico aportado es una persona vulnerable a la situación de pandemia, entendiendo este tribunal tras su valoración, que no es excusa para no presentarse ante esta sala de audiencias, ya que la misma juzgadora resulta ser una persona vulnerable por haber dado a luz recientemente y estar lactando, lo que no impide que en el momento actual de la pandemia, donde las condiciones de tratamiento han mejorado, se presente a sus labores; por lo que **<u>emite orden de arresto en su contra</u>** y sobresee el proceso respecto del mismo, hasta tanto sea presentado. .[9]*

---
[9] Attached to this Complaint as **Exhibit E** is a certified translation of this excerpt.

89.     On that same date, also sent the following Whats App Message to Guillermo Cortijo, the General Director of Bahia Principe Hotels:

> *De momento si entra en el país va preso de una vez y ahora a solicitar la extradición a USA a ver si me lo traigo para aquí y lo ponemos en el banquillo de los acusados, cada dia se le ponen las cosas mas feas. No se puede joder a la gente y no esperar consecuencias.*[10]

90.     On **December 21, 2020,** Plaintiff Bravo traveled to the Dominican Republic to quash the arrest warrant. The court quashed the arrest warrant, but as a condition of pre-trial release Plaintiff Bravo is currently required to appear in the Dominican Republic on the 21st of each month and to "sign in" with the court.

## IX.     Huesca Threatens to Harm Bravo if He Does not Pay Him

91.     On January 20, 2021, Plaintiff Bravo traveled to the Dominican Republic to "sign in" with the court as part of his pre-trial conditions of release.

92.     Following the hearing, Plaintiff Bravo and Defendant Huesca met in person at Huesca's office located in Punta Cana, Dominican Republic.

93.     At the meeting, Defendant Huesca demanded payment of the $200,000.00 penalty and an additional $83,333.33 x 9 months ($749,999.97) to settle the criminal fraud action for a total of ***$947,999.97.***

---

[10] *Id.*

94.    At the meeting, Defendant Huesca advised Plaintiff Bravo that, so far, Defendant Huesca and his lawyers had only "shot to *wound*" Plaintiff Bravo, but now Defendant Huesca intended to "shoot to kill" if Plaintiff Bravo did not accede to Huesca's monetary demands.

95.    At the meeting, Defendant Huesca threatened Plaintiff Bravo that "you will not be able to go back in time and things will get much worse for you" and that Huesca would continue to pursue the criminal action against Plaintiff Bravo, Plaintiff Holidays Network Group, and the other related entities.

96.    To this date, Plaintiff Bravo is obligated to travel to the Dominican Republic.

97.    Each time Plaintiff Bravo travels to the Dominican Republic, there is a risk that he will be detained pursuant to the sham criminal proceeding initiated by Defendant Huesca.

## X.    Monetary Damages Resulting from The Criminal Action

98.    To date, Plaintiff Bravo has incurred Tens of Thousands of dollars in legal fees and costs associated with defending the specious and sham criminal proceeding initiated by Defendant Huesca.

99.    Shortly after the filing of the criminal fraud action in the Dominican Republic, Plaintiff Bravo notified Prestamos regarding the existence of the criminal action.

*100.*    Bravo also advised Prestamos that Prestamos was *a defendant in the criminal action.*

101.   Upon notice of the filing of the criminal fraud action in the Dominican Republic and notice that Prestamos was included as a defendant in the criminal action, Prestamos cancelled the 2019 Agreement with Plaintiff Holidays Lounge and Plaintiff Ascendant Holidays, and Club Ancora.

102.   The termination of the 2019 Agreement has resulted in substantial monetary damages to Plaintiffs of no less than One Hundred Thousand dollars.

## CLAIM ONE

## ABUSE OF PROCESS

**(Plaintiffs –Holiday Networks Group and Bravo
(Defendant HUESCA)**

103.   Plaintiffs reallege and incorporates by reference each of the above paragraphs as if fully set forth herein.

104.   Defendant Huesca willfully and intentionally commenced a criminal fraud action against Plaintiffs Bravo, Prestamos, Plaintiff Holidays Network Group, and other companies alleged herein.

105.   The criminal fraud action for fraud in the Dominican Republic is a sham proceeding.

106.   The criminal action for fraud was designed to extort money from and to intimidate Plaintiff Bravo, Prestamos, and Plaintiff Holidays Network Group, and other companies alleged herein in violation of federal and Florida law.

107.   The commencement and continuation of this criminal fraud action constitutes a willful and intentional misuse of process for some wrongful and unlawful object - violations of Federal and Florida law.

108.   Prior to the filing of the criminal action for fraud, Defendant Huesca threatened to put Plaintiff Bravo in jail based on Defendant Huesca's connections to powerful and influential government officials in the Dominican Republic if Plaintiff Bravo did not continue performance of the unconscionable Big Pond-Aeroyacht Club contract.

109.   Prior to the filing of the criminal action for fraud, Plaintiff Bravo, through Big Pond Enterprises, initiated a civil lawsuit against Defendant Huesca and Aeroyacht Club based on Defendant Huesca's breach of the Big Pond-Aeroyacht Club marketing agreement and the unconscionable nature of said agreement.

110.   Following the willful filing of the criminal action for fraud, Defendant Huesca has threatened Plaintiff Bravo with economic harm.

111.   Following the willful filing of the criminal action for fraud, Defendant Huesca has represented to Plaintiff Bravo that he will continue his campaign to incarcerate Plaintiff Bravo unless Plaintiff Bravo pays Defendant Huesca and/or Aeroyacht Clubs the sum of ***nearly One Million dollars*** in violation of Federal and Florida law.

112.   Defendant Huesca's initiation of the criminal action has caused damages to Plaintiffs, including the payment of legal fees and costs.

WHEREFORE, Plaintiffs pray that this Court (i) award monetary damages of no less than One Hundred Thousand dollars; (ii) award punitive damages; and (iii) award any other relief the court deems appropriate.

## CLAIM TWO

## TORTIOUS INTERFERENCE WITH PRESTAMOS CONTRACT AND RELATIONSHIP

**(Plaintiffs- Bravo, Holiday Networks Group, Holidays Lounge
and Ascendant Holidays)
(Defendant HUESCA)**

113.  Plaintiffs reallege and incorporates by reference each of the above paragraphs as if fully set forth herein.

114.  When Defendant Huesca filed the criminal action against Plaintiff Bravo, Plaintiff Holidays Network Group, Prestamos, and others, Defendant Huesca knew that Plaintiff Holidays Lounge, Plaintiff Ascendant Holidays, and Plaintiff Bravo had entered into the 2019 Agreement with Prestamos.

115.  When Defendant Huesca filed the criminal action against Plaintiff Bravo, Plaintiff Holidays Network Group, Prestamos, and others, Defendant Huesca did so without justification and with the intent to undermine, circumvent, disrupt, frustrate and/or cause the termination of the 2019 Agreement with Prestamos.

116.  As a result of the sham criminal action filed by Defendant Huesca against Plaintiff Bravo, Plaintiff Holidays Network Group, Prestamos, and others,

Prestamos terminated the 2019 Agreement with Plaintiff Ascendant Holidays, Plaintiff Bravo, Plaintiff Holidays Lounge, and Club Ancora S.A.

117.  By reason of Prestamos' termination of the 2019 Agreement, Defendant Huesca has caused damages to Plaintiff Bravo, Plaintiff Ascendant Holidays, Plaintiff Holidays Network Group, and Plaintiff Holidays Lounge.

118.  In fact, Plaintiff Bravo, Plaintiff Ascendant Holidays, Plaintiff Holidays Lounge, and Plaintiff Holidays Network Group have lost their main line of credit due to the sham criminal proceeding initiated by Defendant Huesca against Plaintiff Bravo, Plaintiff Holidays Network Group, Prestamos, and others.

WHEREFORE, Plaintiffs pray that this Court (i) award monetary damages of no less than One Million dollars ($1,000,000.00); (ii) award punitive damages; and (iii) award any other relief the court deems appropriate.

## CLAIM THREE

## VIOLATION OF FLA. STAT. SECTION 501.201, FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

**(Plaintiff- Bravo and Holiday Networks Group)**
**(Defendant HUESCA)**

119.  Plaintiffs reallege and incorporates by reference each of the above paragraphs as if fully set forth herein.

120.  FDUTPA declares unlawful any "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

121.   FDUTPA states that, as its mission, it is designed to "protect the consuming public and legitimate business enterprises" from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. See Fla. Stat. §501.202(2).

122.   A violation of FDUTPA may be based upon a violation of "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *See* Fla. Stat. §501.203 (3)(c).

123.   Florida and federal law proscribe unfair or unconscionable acts and practices. *See* 18 U.S.C. §1951, Fla. Stat. §836.05, and 18 U.S.C. §875(d).

124.   Defendant Huesca, through Aeroyacht, engaged in or continues to engage in unconscionable, unfair, and deceptive trade practices or acts which caused or are causing an actual pecuniary loss to Plaintiff Bravo, Plaintiff Holidays Network Group, and others.

125.   FDUTPA provides for a private right of action for any person who suffered a loss caused by a violation of FDUTPA. *See* Fla. Stat. § 501.211.

126.   Plaintiff Bravo and Plaintiff Holidays Network Group are persons having suffered a loss caused by Defendant Huesca's violations of FDUTPA. *See* Fla. Stat. § 501.211.

127.    Further, Plaintiff Bravo and Plaintiff Holidays Network Group, are "interested parties" or "persons" because Plaintiff Bravo and Plaintiff Holidays Network Group are persons affected by a violation of FDUTPA. *See* Fla. Stat. §501.203 (6).

128.    Plaintiff Bravo and Plaintiff Holidays Network Group may also "recover actual damages and attorneys' fees" because Plaintiffs suffered a loss as a result of the violations caused by Defendant Huesca. See Fla. Stat. §501. 211(2).

WHEREFORE, Plaintiffs pray that this Court (i) award treble damages of no less than One Hundred and Ninety Thousand dollars ($198,000); (ii) award punitive damages; and (iii) award any other relief the court deems appropriate.

Respectfully submitted,

FELDMAN FIRM PLLC
Southeast Financial Center
200 S. Biscayne Blvd
Suite 2770
Miami, Florida 33131
Direct: 305.714.9474
*Counsel for Plaintiffs*

**By**: /**s/Andrew S. Feldman**
              Email: afeldman@feldmanpllc.com